Filed 1/13/21  P. v. Ramirez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058916 |
| v. | (Super. Ct. No. 19HF0780) |
| FERNANDO RAMIREZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed in part, reversed in part.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Fernando Ramirez of aggravated battery with serious bodily injury and a misdemeanor civil rights violation.  It further found the battery was a race-based hate crime.  Defendant was sentenced to a six-year prison term, comprising an upper term four years for the battery and a consecutive two-year term for the hate crime enhancement.  A six-month concurrent jail sentence was imposed for the civil rights conviction.

Defendant contends the trial court erred by denying his motion to suppress statements he made to police after his arrest, claiming they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  We agree.  As a result, the true finding on the hate crime enhancement and the civil rights conviction must both be reversed.  The aggravated battery conviction is unaffected by the *Miranda* error, however, and that portion of the judgment is affirmed.

## FACTS

M.R. worked at a Laguna Beach grocery store.  Returning to the store one morning after his break, he heard someone run up from behind.  When he turned around, defendant punched him in the face, breaking his nose and several teeth, and knocking him to the ground.  A nearby couple saw the unprovoked attack, and watched defendant run off after he punched M.R.  They called 911, and followed defendant until police arrived and apprehended him.  M.R. is an African-American man who, at the time he was attacked, wore his hair in dreadlocks.  He had cut off his dreadlocks by the time of trial because he feared for his safety and wanted to change his appearance following his victimization.

A responding police officer, Randy Bitonti, saw defendant running down the street, with his fists clenched and flailing around.  Defendant was arrested and placed in the backseat of Bitonti's patrol SUV.  On the way to the station house, a video camera recorded a conversation between Bitonti and defendant, parts of which were shown to the

jury at trial. During this exchange, defendant said, among other things, that the reason he sucker punched M.R. was because M.R. was Black and he hated all Black people.

## DISCUSSION

Defendant claims the statements he made in the back of Bitonti's SUV were illegally obtained because he had invoked his *Miranda* rights beforehand. He further argues admission of those statements at trial constituted prejudicial error under *Chapman v. California* (1967) 386 U.S. 18, and reversal of the hate crime enhancement and misdemeanor civil rights offense is required. We agree with both contentions.

### 1. Additional Factual Background

Before trial, defendant moved to exclude all his statements to police, including those he made in the SUV, claiming they were taken in violation of *Miranda*. The court held an evidentiary hearing, at which Bitonti testified.

Bitonti said he answered a call of a battery in downtown Laguna Beach. When he first arrived at the scene, the suspect—defendant—appeared agitated and "very animated." Bitonti got out of his SUV, handcuffed defendant, patted him down, and asked him to sit on the curb. He asked defendant what had happened, and defendant said he was in a public restroom near the bus terminal when someone called him a name, and he had reacted to being called that name.

Bitonti left to speak with the witnesses, while a second officer stood by with defendant. When Bitonti returned, the second officer told him he had read defendant his *Miranda* rights, and said defendant "was pleading the Fifth," and "he doesn't want to talk, he wants a lawyer." Despite knowing defendant had invoked his *Miranda* rights, Bitonti asked defendant "You don't wanna talk? I thought you were gonna tell me what happened . . . . [¶] [Y]ou didn't really finish that's why I was just curious if there was more to it." Defendant again said he had been called a racial slur by M.R. in a transit center restroom.

3

Bitonti formally arrested defendant and placed him in the backseat of his SUV. As they were driving to the station house, the following conversation ensued:

"[Defendant]: So what am I going to jail for?

"Bitonti: For punching somebody[.]

"[Defendant]: Who? The n*****?

"Bitonti: Huh?

"[Defendant]: The n*****?

"Bitonti: I can't hear you[.][1]

"[Defendant]: A n*****?

"Bitonti: Who's that?

"[Defendant]: A n*****?

"Bitonti: I don't know is that who it was?

"[Defendant]: Is it . . . so it's a hate crime?

"Bitonti: Is it a what?

"[Defendant]: Is it a hate crime?

"Bitonti: You tell me.

"[Defendant]: I don't know, you tell me[.]

"Bitonti: Is that why you punched him?

"[Defendant]: I fucking hate [B]lack people. Segregate me. You hear me?

"Bitonti: What's that?

"[Defendant]: Segregate me from the fucking n******. You hear me?

"Bitonti: I hear you."

"[Defendant]: Alright cool. So in the fucking county [jail], don't get me next to 'em. Okay cool?

---

[1] Bitonti testified there was a Plexiglass shield separating the front and back seats of the SUV and even though there was a microphone in back, it was difficult to hear someone talking from the back seat, especially when the vehicle is moving.

"Bitonti:  That's going to be up to them in the [jail].

"[Defendant]:  Alright cool. I'll fucking do something stupid then.

"Bitonti:  Why? What's the point?

"[Defendant]:  'Cause I fucking hate them.  They always talk shit on me[,] call me a beaner and a spic. I get tired of it dude."

The conversation continued with defendant once more requesting to be segregated at the jail.  Defendant then again inquired:

"[Defendant]: So what am I going to jail for?

"Bitonti:  Battery.

"[Defendant]:  That a misdemeanor?

"Bitonti:  You punched that guy right?

"[Defendant]:  I don't know. Who are they?

"Bitonti:  That's what you told me.

"[Defendant]:  That's it?  For a hate crime?  Just fucking had it dude. Ok?

"Bitonti:  You punched him because he [w]as [B]lack?

"[Defendant]:  Yeah.

"Bitonti:  It wasn't for no other reason?

"[Defendant]:  Yeah.  He called me a beaner.

"Bitonti:  When?

"[Defendant]:  In the bathroom.

"Bitonti:  Just randomly?

"[Defendant]: Yeah.  He called me a beaner and spic."

The conversation continued with defendant once more imploring Bitonti to ensure he would be segregated from Black inmates at the jail, and telling him, "Segregate me from the black prison [*sic*].  It was racial alright?  It was a racial assault.  Ok?"

After Bitonti testified, the prosecutor told the court he did not intend to introduce any statements defendant had made to Bitonti while he was seated on the curb

5

and after he had received the *Miranda* advisement and invoked his rights. The trial court excluded those statements.

But with respect to the interchange inside the SUV, the prosecutor argued there was no *Miranda* violation because defendant had initiated the conversation to ensure he would be segregated from Black inmates at the jail, and because Bitonti was therefore not interrogating defendant. Defense counsel responded that, despite knowing defendant had invoked his rights, Bitonti continued to ask questions likely to elicit an incriminating response without making any effort to re-*Mirandize* defendant.

The court denied the motion to suppress the statements made in the SUV. It relied on the fact Bitonti did not initiate the conversation, and any questions he did ask appeared to be because he could not hear defendant over the traffic noise. As such, the court found this did not amount to interrogation. It also found that because defendant had initiated the backseat conversation, he implicitly waived his right "to remain silent." Notably, the court made no findings regarding defendant's concomitant right to counsel, which defendant had also invoked.

2. *Legal Background*

A. *Standard of Review*

"On review, '"we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*."'" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When, as here, "'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.'" (*People v. Suarez* (2020) 10 Cal.5th 116, 158.)

B. *Custodial ReInterrogation After a* Miranda *Invocation*

We begin with a basic premise: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial

6

interrogation even if he has been advised of his rights. . . . [There is to be no] further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485, fn. omitted (*Edwards*); accord, *People v. Molano* (2019) 7 Cal.5th 620, 654 (*Molano*); see *Michigan v. Mosely* (1975) 423 U.S. 96, 100 [same for right to silence].)

"'An accused "initiates"' further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion *relating directly or indirectly to the investigation*."'" (*Molano, supra*, 7 Cal.5th at p. 656, italics added.) Here, defendant's primary desire in reinitiating a conversation with Bitonti had nothing to do with the investigation into the offense for which he was arrested. Instead, defendant's sole concern was where he would be housed in the county jail, and with whom. In fact, defendant implored Bitonti numerous times to include a hate crime allegation in the charges just so he could be "segregated" from the Black prisoners, using the term "segregate" nine times.[2] While the conversation provided some especially probative evidence for use in the prosecutor's case, we cannot reasonably conclude defendant's racist comments about his upcoming jail housing somehow also reflected a desire to abandon his earlier invocation and instead waive his *Miranda* rights and discuss his crimes. (See *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045, (plur. opn. of Rehnquist, J.) (*Bradshaw*) ["[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*"].)

---

[2] E.g., "Bitonti: Why do you want [a hate crime charge] so badly? [¶] [Defendant]: 'Cause I want to get segregated from the [B]lack people." [¶] "Bitonti: Are you just saying that because you want to get segregated in [the jail]? [¶] [Defendant]: Yeah, I want to get segregated."

More importantly, a defendant's mere initiation of further conversations with police is not alone sufficient to open the door to reinterrogation. "In the event [a defendant] does in fact 'initiate' dialogue, the police may commence interrogation *if he validly waives his rights*. (*People v. Mickey* (1991) 54 Cal.3d 612, 649; citing *Bradshaw, supra,* 462 U.S. at p. 1044; *Edwards, supra*, 451 U.S. at p. 486, fn. 9, italics added.)

Consequently, "'"[w]here reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a *waiver* of the Fifth Amendment right to have counsel present during the interrogation.'" [Citations.] Thus, the People must show *both* that the defendant reinitiated discussions *and* that he knowingly and intelligently *waived the right he had invoked*. [Citation.] If instead the police reinitiate discussion without a break in custody, any further statements by the defendant are presumed involuntary and rendered inadmissible." (*People v. Gamache* (2010) 48 Cal.4th 347, 385 italics added; citing *McNeil v. Wisconsin* (1991) 501 U.S. 171, 177; accord, *Molano, supra*, 7 Cal.5th at p. 654; *Bradshaw, supra*, 462 U.S. at p. 1044 ["[A]n 'initiation' of a conversation or discussion by an accused [does not] satisf[y] . . . to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together"].)

Here, even assuming defendant's concerns over "segregated" jail housing can reasonably be characterized as "initiating" a conversation in the sense the *Edwards* court intended, which we do not hold, the prosecutor failed to produce anything to support a further inference that in doing so defendant was withdrawing his quite recent *Miranda* invocations, and was now waiving his rights to silence and counsel.

No inquiry or reminder was made to defendant about his earlier advisal and invocation; no partial readvisal or clarifying questions were asked. In fact, when Bitonti was first told about defendant's unequivocal invocations by the second officer, his immediate response was to question defendant: "You don't wanna talk? I thought you were gonna tell me what happened though[.] [¶] . . . Okay you didn't really finish[,]

8

that's why I was just curious if there was more to it." Bitonti proceeded to pick up the original interrogation where it left off, and improperly asked defendant 17 more questions before finally saying, "Well, if you think of anything else, go ahead and let my partner know." There is nothing in the record to indicate Bitonti was even *aware* of the *Edwards* rule, let alone that he attempted to comply with it.

The prosecutor appears to have been familiar with at least the first part of the relevant inquiry, and argued defendant had reinitiated the conversation with Bitonti from the backseat. As to the crucial second prong, however, the prosecutor offered nothing to overcome the still presumptively involuntary and inadmissible nature of those postinvocation statements by failing to produce any evidence pointing to a *Miranda* waiver, whether explicit or implicit.

The Attorney General argues the interaction in the SUV was merely a "casual conversation," and because Bitonti did not "converse" with defendant "with the intent of eliciting an incriminating response," he was not really interrogating him. Even assuming this is true, of which we are not convinced, Bitonti's intent is not the question. The relevant issue is *defendant's* state of mind, and whether there is any evidence of a knowing and voluntary waiver of *Miranda* rights. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1199-1200.)[3]

Furthermore, for *Miranda* purposes, "interrogation" also includes the "'functional equivalent' of questioning," which includes remarks police *should know* are

_____

[3] Bitonti's "intent" here is far from clear. What *is* clear, however, is he had already unabashedly disregarded defendant's invocation by questioning him at curbside immediately after he was made aware defendant had invoked both his right to counsel and right to remain silent. (See *Miranda, supra*, 384 U.S. at pp. 473-474 ["Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner . . . that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present"]; see also *People v. Krebs* (2019) 8 Cal.5th 265, 314; citing *Michigan v. Mosley* (1975) 423 U.S. 96, 104 [an invocation must be "scrupulously honored"].)

9

reasonably likely to elicit an incriminating response. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 ["this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police"].) This is an objective standard, and not dependent on Bitonti's subjective intent. "Is that why you punched him?" and "You punched him because he [w]as [B]lack" are more than reasonably likely to elicit incriminating responses, and are not merely parts of a "casual conversation," irrespective of Bitonti's subjective "intent."

The Attorney General also points out defendant had "prior run-ins" with the law, and was therefore familiar with *Miranda,* and argues those previous experiences show he implicitly withdrew his previous invocations and now wished to waive his rights by responding to Bitonti's questions without the attorney he had previously requested. As support for this non sequitur, he cites *North Carolina v. Butler* (1979) 441 U.S. 369 (*Butler*), but that case is singularly inapt.

First, *Butler* is not a postinvocation case; the defendant did not invoke his rights, nor did he later initiate a conversation with police. Instead, during the *initial* advisal of rights, the defendant said he understood them, but refused to sign an explicit waiver form. (*Butler, supra*, 441 U.S. at p. 371.) Second, the issue before the high court was whether a waiver of the right to counsel need be explicit, or whether it may be implied. Rejecting the "inflexible per se rule" set down by the North Carolina Supreme Court that a waiver be explicit *and* be in writing, the court reversed, and held that, depending on the circumstances, an implied waiver can indeed be valid. (*Id.* at pp. 375-376.)

More importantly, the Attorney General's argument in this regard proves too much. *Every* postinvocation defendant is "familiar with" his or her *Miranda* rights:

10

after all, he or she has already been advised and has invoked them.[4] But it does not follow that a defendant's mere awareness of his or her *Miranda* rights results is an implicit *waiver* of those rights if he or she merely responds to postinvocation police interrogation.

"If, after a suspect has refused to waive his or her right to have counsel present during questioning, a limited inquiry such as that made by defendant regarding" where and with whom he would be housed at the county jail "were deemed to open the door to interrogation, the opportunities for officers to avoid the constraint of the *Miranda* rules would be great." (*People v. Sims* (1993) 5 Cal.4th 405, 444.) Indeed, this case perfectly "illustrates the ease with which the bar imposed by the suspect's invocation of rights could be dissipated if that invocation is not scrupulously honored." (*Ibid.*) Defendant's statements made to Bitonti in the SUV were obtained in violation of *Miranda,* and should have been excluded. The trial court's denial of defendant's motion to suppress these statements therefore constituted error.

*C. Remedy*

The parties agree that if defendant's SUV statements were erroneously admitted, such error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18. We concur.

The *only* evidence presented at trial to establish defendant's racial motivations for his attack on M.R. were the statements he made in the back of the SUV. As such, they were essential to the jury's finding on the hate crime enhancement and the

---

[4] The Attorney General also characterizes the dialogue in the SUV as merely a "continued conversation," presumably referring to the curbside conversation Bitonti had with defendant before he had invoked. However, as the prosecutor conceded below, the contents of the postinvocation curbside conversation were illegally obtained. And as such, any "continued conversation" was actually a *tainted* continuation of Bitonti's illegal curbside interrogation. And without any evidence of an intervening waiver, the entire tainted "conversation" remained just that: tainted.

11

misdemeanor civil rights conviction, and this error cannot be considered harmless beyond a reasonable doubt.  (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 310; see also *People v. Liggins* (2020) 53 Cal.App.5th 55, 69 ["Because prejudice is uncontested, the error in admitting the challenged statements requires reversal"].)

## DISPOSITION

Defendant's conviction for the civil rights violation and the true finding on the hate crime enhancement are reversed and the sentences vacated.  The aggravated battery conviction is not affected by the *Miranda* error, and defendant does not argue otherwise.  It is therefore affirmed.

The matter is remanded for further proceedings consistent with this opinion.  If the prosecution does not elect to retry defendant on the civil rights violation charge and the aggravated battery enhancement, the trial court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.


12